```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TENNESSEE
                         WESTERN DIVISION
```
_____

```
UNITED STATES OF AMERICA,      )
                               )
     Plaintiff,                )
                               )
v.                             )
                               )   No. 06-20343-Ma/P
DEMOND KEVIN JONES,            )
                               )
     Defendant.                )
```
_____

### REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Demond Kevin Jones's Motion to Suppress, filed July 26, 2010. (D.E. 56.) The United States ("government") filed a response in opposition on September 16, 2010. On November 3, 2010, the court held a suppression hearing.[1] At the hearing, the court heard testimony from William Thomas, Memphis Police Department ("MPD") Officer Selgyna McQueen-Brown, and Jones. The court admitted as evidence one exhibit, a compilation of photographs depicting the evidence seized from Jones's residence and his vehicle. At the conclusion of the hearing, the court granted Jones's request to file a post-hearing brief. Jones filed his brief on January 3, 2011, and the government filed its response on January 20.

Based on the briefs filed in support of and in opposition to

---

[1]The suppression hearing was initially set for September 29, but was continued at Jones's request to November 3.

the motion, the evidence presented at the hearing, and the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the motion to suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

The court has carefully considered the testimony of all of the witnesses, including their demeanor as they testified at the hearing.  The court finds the government's witnesses (Thomas and Officer McQueen-Brown) to be credible and Jones to be not credible.  Therefore, the court adopts the government's witnesses' version of events as its proposed findings of fact.

Sometime in 2004, Larry Gordon began renting a two-bedroom townhouse located at 1961 Rembert Place, in Memphis, Tennessee. The townhouse was managed by William Thomas and owned by Thomas's parents.  Although only Gordon's name appeared on the lease, he shared the residence with defendant Demond Kevin Jones, who helped pay some of the rent.  Thomas personally knew Jones from high school (although he knew Jones by the names "Anthony" and "Kevin") and was aware that he was sharing the townhouse with Gordon. Sometime in 2005, Gordon and Jones began falling behind in their rent payments and failed to pay rent for three months, at which time Thomas initiated eviction proceedings.  In May of 2005, Thomas filed a detainer warrant issued from the Shelby County Court of General Sessions.  (Pla.'s Br., D.E. 66 Ex. 1; Tr. at 12, 45-46.)

On September 14, 2005, a judgment and writ of possession was entered in favor of Thomas, which authorized Thomas to evict the tenants and remove their property from the townhouse. (Id.; Tr. at 13.)

On September 21, 2005, at approximately 8:30 a.m., Thomas, accompanied by a Shelby County Sheriff's deputy, a locksmith, and two movers, arrived at the townhouse to evict Gordon and Jones. Thomas noticed that the locks had been changed. After the locksmith opened the front door, the deputy stepped inside to see if anyone was home. Once the deputy confirmed that no one was inside the residence, he left the scene. Thomas and the two movers then began removing items from the first floor and placing them on the curb. After about two hours, they went upstairs where the bedrooms were located. Thomas recognized one of the bedrooms as belonging to Gordon and removed items from that bedroom to the curb.[2]

When Thomas went into the second bedroom, he saw several credit cards, identification cards, and driver's licenses on the night stand and window ledge. He noticed several more credit cards, birth certificates, credit card applications, and passports

---

[2]Thomas testified that Gordon played college basketball and was a "big basketball fan," and that the bedroom he recognized as belonging to Gordon had basketball clothes and large shoes.

in an open, clear plastic bin sitting next to the bed.[3] He also saw a card laminating machine and another open box that stored more identification cards and documents. When Thomas went to inspect some of these cards, he noticed that one of the identification cards contained Jones's personal identification information but displayed a photograph of someone else that Thomas knew. Several of the identification cards displayed a photograph of Jones but had the personal identification information of other individuals, and still other cards had photographs of multiple individuals but displayed the same name. Thomas described what he found as follows:

> Q. All right. And could you please tell the Court what you first noticed suspicious when you went into the large bedroom?
>
> A. A lot of IDs and credit cards on the ledge, window ledge of the bedroom, and also on the nightstand. It was identifications, different -- different -- different identifications.
>
> . . . .
>
> Q. -- to you? What appeared to be suspicious about them to you?
>
> A. There was a large amount of them. It was different names, different pictures with basically the same names on some of the IDs. There was literature or paperwork in a big tub by the bed that had birth certificates, looked like credit apps and just different identification and stuff in the box.
>
> Q. And you personally observed these items?

---

[3]As depicted in Exhibit 1 and as Officer McQueen-Brown testified, the bin was made of clear plastic.

A.   Yes.

. . . .

Q.   So they had different people's names?

A.   Correct.

Q.   But [Jones's] picture?

A.   Correct.

Q.   And again these were on the nightstand?

A.   On the nightstand and on the window ledge.

Q.   All right.  In plain view?

A.   Correct.

Q.   Were they obstructed in any way?

A.   No.

Q.   Did you move anything out of the way to get a look at them?

A.   No.

. . . .

Q.   Okay.  And what about the rest of them?  What else did you see?  Were there any tubs or boxes or anything?

A.   There was a big plastic tub.

Q.   All right.  Let me ask you about that tub.  Did it have a lid on it?

A.   No.

Q.   Was -- were the contents of that tub obstructed in any way?  Were there any t-shirts or anything laying on top of it?

A.   No.

```
Q.    You could plainly see the contents of the tub?

A.    Right.

. . . .

Q.    Okay.  So the tub was sitting there and you put all
      that -- you gathered all the stuff up and put it in
      the tub, correct?

A.    Right.

Q.    And did you put a lid on the --

A.    I did put the lid on the tub and took it to --

Q.    Why did you put the lid on the tub?

A.    To put more boxes on top of the tub to carry.
```
(Tr. at 21-24, 28.)

Upon recognizing the criminal nature of these items, Thomas called a nearby police station, told them what he had found, and was told to bring the items to the station. Thomas collected the items, placed lids on the plastic bin and box, and transported the containers to the station. At the station, he presented the containers to Officer McQueen-Brown and advised her of the contents and his suspicions regarding the items. Officer McQueen-Brown was able to see through the clear plastic bin and recognized several of the items as being fraudulent identification documents. The containers were then placed in a room, at which time Officer McQueen-Brown and other officers began inspecting the documents more closely. Meanwhile, Thomas and one of the officers returned

to the residence.[4]

As the officers were inspecting the items at the station, they received a call from Thomas advising them that Gordon had arrived at the residence and was retrieving his property. Officer McQueen-Brown and other officers then went to the residence, asked Gordon for his identification, discovered that he had an outstanding arrest warrant, and arrested him based on the warrant.[5] Shortly thereafter, Jones pulled into the driveway of the residence driving a Chevrolet Impala. Both Thomas and Gordon pointed Jones out to the officers as the person who lived at the residence with Gordon and who was responsible for the identification documents. Jones attempted to back out of the driveway, but was stopped by the officers. Officer McQueen-Brown approached Jones's vehicle from the driver's side and asked him for identification. He provided a driver's license that displayed his photograph but had someone else's name. Officer McQueen-Brown looked inside the vehicle and

---

[4]Thomas testified that at some point after he returned to the residence, police officers went inside the residence and looked for additional evidence, and that they might have taken a brown paper bag. (Tr. at 32, 35.) Officer McQueen-Brown, on the other hand, testified that officers did not go inside the residence or take anything from inside the home. (Tr. at 77.) Even assuming that one or more officers had, in fact, entered the residence for a brief time, the only evidence that was ever seized came either from the containers taken by Thomas or as a result of Officer McQueen-Brown's search of Jones's vehicle.

[5]Gordon denied to the police that the identification documents belonged to him. According to Thomas, none of the documents that he saw displayed Gordon's photograph or contained his identification information.

saw on the passenger's side an open briefcase containing several identification documents and credit cards.[6]  She also saw several other identification documents stowed in the driver's side door panel.  The officers took Jones into custody based on his possession of fraudulent identification documents and because he had outstanding arrest warrants.  The vehicle was then inventoried and towed to the city lot.

## II.  PROPOSED CONCLUSIONS OF LAW

Jones raises two arguments in his motion to suppress.  First, he argues that the identification documents taken from the residence should be suppressed under the Fourth Amendment because, although Thomas's private search did not implicate the Fourth Amendment, the officers' subsequent search of the containers at the police station exceeded the scope of Thomas's private search.  Second, he argues that the officers violated his Fourth Amendment rights by seizing the briefcase and identification documents from his vehicle.

As an initial matter, the court finds that Jones lacked an

---

[6]Jones testified at the suppression hearing that, among other things, neither he nor Gordon were ever served with notice of the eviction proceedings, the documents and containers taken by Thomas from the residence were not stored in his bedroom, the containers had been taped shut, the briefcase found in his vehicle was actually locked and stored in the trunk of his car, and the identification documents were merely "novelty IDs" that he used when he checked into hotels to protect his privacy.  Jones also testified that Officer McQueen-Brown put her hands around his throat after he was arrested.  As stated earlier, the court finds Jones's testimony to be not credible.

objectively reasonable expectation of privacy in the residence, and therefore he cannot assert a Fourth Amendment challenge to the officers' subsequent search of the containers.  Jones may challenge the evidence taken from the residence only if his "own constitutional rights have been violated."  United States v. Davis, 430 F.3d 345, 359-60 (6th Cir. 2005) (citing United States v. Salvucci, 448 U.S. 83, 86-87 (1980)).  Jones carries the burden of demonstrating that he had a "legitimate expectation of privacy in the place that was searched."  United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001).  Without a legitimate expectation of privacy in the residence, he may not contest the search.  United States v. Dillard, 438 F.3d 675, 682 (6th Cir. 2006).

The court engages in a two-part inquiry to determine whether a legitimate expectation of privacy exists.  "First, we ask whether the individual, by conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private. . . .  Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable."  Bond v. United States, 529 U.S. 334, 338 (2000) (citation, internal quotation marks, and alterations omitted).  "The 'factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched.'"  United States v. Hunyady, 409 F.3d 297, 301 (6th Cir. 2005)

(quoting United States v. McRae, 156 F.3d 708, 711 (6th Cir. 1998)). "Other factors include whether the defendant has the right to exclude others from the place in question; whether he has taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises." United States v. King, 227 F.3d 732, 744 (6th Cir. 2000) (citations omitted).

"By definition, trespassers cannot have an objectively reasonable expectation of privacy in the property on which they are trespassing." United States v. Washington, 573 F.3d 279, 284 (6th Cir. 2009) (citing McRae, 156 F.3d at 711). Although "a landlord's mere authority to evict a person cannot of itself deprive that person of an objectively reasonable expectation of privacy," id., once a landlord has exercised his or her right to evict a tenant, the tenant can no longer possess an objectively reasonable expectation of privacy in the leased property. See United States v. Patrick, F. A'ppx 844, 847-48 (6th Cir. 2007) (holding that evicted defendant lacked a legitimate expectation of privacy and that "the building's owner had open access to all documents that [defendant] left behind, and the owner could permit others to view the documents"); United States v. Allen, 106 F.3d 695, 699 (6th Cir. 1997) (holding that defendant lacked expectation of privacy in motel room after manager learned that defendant was keeping

contraband in the room, locked defendant out of the room, and divested defendant of his status as an occupant); see also United States v. Molsbarger, 551 F.3d 803, 811 (8th Cir. 2009) (stating that "[j]ustifiable eviction terminates a hotel occupant's reasonable expectation of privacy in the room"); United States v. Brown, 961 F.2d 1039, 1041-42 (2d Cir. 1992) (noting in dicta that a defendant who has stopped paying rent and who has been evicted has no Fourth Amendment interest in the property searched).

In the present case, Gordon and Jones failed to pay rent for three months, Thomas initiated eviction proceedings by filing a detainer warrant, he obtained a judgment and writ of possession, and he took possession of the residence and removed the tenants' property as authorized by the court. Because Jones was lawfully evicted and therefore lacked an objectively reasonable expectation of privacy in the place searched, the court submits that his motion to suppress the items taken by Thomas to the police station should be denied.

Moreover, even assuming, *arguendo*, that Jones had the requisite expectation of privacy, the court submits that the officers' search of the containers did not impermissibly exceed the scope of Thomas's private search. "'The Fourth Amendment is 'wholly inapplicable [] to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of

-11-

[a] governmental official.'''" Bortner v. Sheldon, No. 3:08CV2615, 2009 WL 3172878, at *2 (N.D. Ohio Sept. 25, 2009) (quoting United States v. Williams, 354 F.3d 497, 509 (6th Cir. 2003) (quoting United States v. Jacobsen, 466 U.S. 109, 114-15 (1984))). However, "'the [g]overnment may not exceed the scope of the private search unless it has an independent right to search,'" id. (quoting Williams, 354 F.3d at 509), and "[i]f officers examine objects or containers that the private parties did not examine, the officers have exceeded the scope of the private search." Id. (citing United States v. Runyan, 275 F.3d 449, 464 (5th Cir. 2001)).

Jones contends that the officers' search of the containers exceeded the scope of the private search because "the [g]overnment was not substantially certain the containers contained only contraband or if in fact they contained contraband at all. The government only had substantial certainty that the storage containers may contain contraband." (Def.'s Mot. at 8.) In support of this argument, Jones relies heavily on the Supreme Court's decision in United States v. Jacobsen. In Jacobsen, the contents of a package being delivered by Federal Express ("FedEx") were revealed to FedEx employees after a forklift damaged the outer packaging. Id. at 111. Per an insurance claim policy, the employees opened the package and discovered a white, powdery substance stored in plastic bags. The employees then contacted the Drug Enforcement Administration ("DEA") and subsequently replaced

-12-

the plastic bags that contained the powder.  Id.  They turned over the package to the DEA, and the DEA agents then reopened the tubing that contained the plastic bags, opened the plastic bags, and field tested the substance inside the bags to determine whether it was cocaine.  Id. at 111-12.  The Court held that "no constitutionally protected privacy interest that had not already been frustrated as the result of private conduct" was infringed when government officials field tested the white powder discovered by the employees.  Id. at 119.  The Court stated:

> [t]he fact that, prior to the field test, respondents' privacy interest in the contents of the package had been largely compromised, is highly relevant to the reasonableness of the agents' conduct. . . .  The agents had already learned a great deal about the contents of the package from the Federal Express employees, all of which was consistent with what they could see.  The package itself, which had previously been opened, remained unsealed, and the Federal Express employees had invited the agents to examine its contents.  Under these circumstances, the package could no longer support any expectation of privacy[.]

Id. at 121.

Instead of supporting Jones's argument, Jacobsen actually supports the constitutionality of the officers' search.  By the time the containers were presented to the officers at the station, Jones's privacy interest in the contents of the containers had already been "largely compromised."  Thomas had already seen several credit cards, driver's licenses, and other fraudulent identification documents displayed openly on the night stand and window ledge.  The clear plastic bin and box, neither of which had

-13-

lids on them, contained additional identification documents that Thomas had seen in plain view.  He also had seen a card laminating machine, which is commonly used to make false identification cards.  Upon closer inspection of several identification cards, Thomas had recognized that the cards contained fraudulent identification information.  He collected the cards and documents from the night stand and window ledge, put them in the containers with the other identification documents, brought them to Officer McQueen-Brown, and told her about what he had found.  Officer McQueen-Brown was able to see through the plastic bin and recognized several of the items as being fraudulent identification documents.  Thus, like in Jacobsen, even before the officers conducted a more thorough search of the contents of the containers, they had probable cause to believe that the containers stored evidence of a crime.  Furthermore, the officers' search in the present case was not as intrusive as the search that was upheld in Jacobsen, where the agents conducted tests on the white powder to determine its composition.  Under the circumstances, the officers' actions in going through the contents of the containers were reasonable and therefore not in violation of the Fourth Amendment.

Finally, the officers did not violate Jones's Fourth Amendment rights by searching his vehicle and seizing the identification documents found inside the car.  "Under the automobile exception to the warrant requirement, law enforcement officers may search a

-14-

readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime." United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (citing United States v. Ross, 456 U.S. 798, 799 (1982)). Prior to searching the vehicle, Officer McQueen-Brown looked through the driver's side window and could see in plain view credit cards and identification documents in an open briefcase on the passenger's side and stored in the driver's side door panel. While the officer may not have been able to see the actual identification information on the documents, she at least knew that they were identification-related documents and that there were many of them inside the vehicle, which by itself is incriminating. Moreover, she had just looked through two large containers filled with fraudulent identification documents that were obtained from Jones's residence, Thomas and Gordon identified Jones as the person who lived at the residence and was responsible for the documents, and Jones provided Officer McQueen-Brown with a fake driver's license when she asked for his identification.[7] Based on the totality of the circumstances, the court submits that the officers had probable cause that the vehicle contained fraudulent identification

---

[7]Because the court concludes that the search of Jones's vehicle was clearly justified under the automobile exception, the court does not reach the issue of whether the search was justified on other grounds, such as whether the evidence would have been "inevitably discovered" as a result of the vehicle inventory search.

documents, and therefore, the motion to suppress the evidence seized from the vehicle should be denied.

### III.  CONCLUSION

For the reasons above, the court recommends that Jones's motion to suppress be denied in its entirety.

Respectfully submitted,

/s Tu M. Pham
_____
TU M. PHAM
UNITED STATES MAGISTRATE JUDGE

March 12, 2011
_____
DATE

**NOTICE**
**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**